Please. Case number 3-18-04-96. In re the Estate of Anthony J. Imburgia, deceased. Michael J. Imburgia, executor. Appellee by Michael Cassano versus Michael D. Imburgia, appellant by H. Kent Heller. Thank you. Mr. Heller. Thank you. May it please the Court. Counsel, if you were to read about this case in the context of a disciplinary proceeding, you would not be surprised. I suggest to you that one of the facts that indicates what was going on here is the day after the current counsel entered their appearance for the executor, there was a proposed distribution filed which showed distributions to the 10 grandchildren who were residual beneficiaries of $127,000 apiece. And yet, after all this litigation, after all the money that was spent on executor's or attorney's fees, the current file shows that the estate has miraculously grown and the proposed distribution is $157,000 for each. So there's at least $300,000 that has been generated as a result of this litigation and the poking and the pushing that has come. But when you look at the facts, it appears that this was an all-out attempt to shrink, diminish, move the assets of this estate. This is a primer on how not to handle an estate. For example, every month the lawyer who represents the executor writes himself a check for the attorney's fees that he has earned. And then shortly before the Federal estate tax return is due, he writes himself a check for $250,000 for fees not approved by the court, not pursuant to any agreement, and leaves the estate short of money to pay the estate taxes so they have to pay a penalty to the IRS. How does he write himself a check? He tells the executor to write a check, and the executor writes a check. I'm sorry. More accurately, the executor would write a check. Correct. But I think if you look, the attorney is the agent of the executor, and they did this hand-in-hand all the way through. There's never any disagreement. And this, quote, fixed fee, where's the writing that reflects it? What's to be done for the $250,000? And even more interestingly is that at the end, right before the case goes on appeal, the attorney for the estate then asks for additional fees. And when that hearing is held, the judge says to him, well, you had a fixed fee. You were going to do that for the $250,000. Oh, you must have done more work. And so he's awarded additional fees. Think about what would happen if your wife came home and said, your husband came home and said... How much were the additional fees? I don't remember. And how much was the monthly fee? It is in the record. But there were several thousand dollars every month for nine months. Okay. At the time of the deposition, which is part of the record, the lawyer didn't say it was a fixed fee. What he said was, I went back and looked at my records, and this $250,000 is for the time that I was thinking about the case and the extra time that I spent that I didn't write down that I didn't pay myself for. So the story changed over the course of the proceedings. And what about Valley Farms? I mean, you've got a business that lost $13 million in the preceding 15 years. You value it on the estate tax return at $2 million and pay $1 million in tax. Then you make unsecured loans to that corporation for $2 million, or $1.5 million, and you sell it for $750,000. Even their experts said that's not a very good program. What about simple things? What about the Bears and Cubs tickets? Now, these aren't tickets to U of I games. These are the Bears. And the executor says, well, they don't have any value. So I just kept them for myself. Is that how we handle estates? Is that how we tell lawyers to administer the estate, whatever you want if you don't think it has any value? And does it have value? Of course it has value. He didn't have to take it for himself. And yet, as opposed to saying, you know, we need to call the executor accountable for any of this conduct, the trial court simply gave him a pass and approved all of these transactions without regard to how, even on their face, how inappropriate they look. You don't just go in and write yourself a check for $250,000 without getting approved by the court. You don't take as executor property from the estate that you want and keep for yourself to the detriment of all of the others. You don't make loans that aren't prudent. And tell me in the record what there is in the record that shows what that money went for. There's absolutely nothing. There's no indication that it bought equipment. And if it did, there's no security interest in the equipment that it bought. There's, well, they need money, so we send them money. But it wasn't their money to send. That money belonged to the grandchildren and the siblings of the executor. His response to the precise question of why did you do it, he says, well, that's what the decedent would have done. That's not the test for whether an investment or an expenditure of money on the estate is prudent. It's whether a prudent person would do it. And who would send $2 million to a company that lost $13 million in the preceding 15 years with no security and no indication that it would do anything but be wasted? He could have just as easily not valued that corporation at zero. If he could have thrown the stock away, and this estate would have been almost $3 million better off. If he just ripped up the certificates and walked away, the estate would have been $3 million better off than paying the tax on it and then sending the $2 million to them. And yet, that's evidently okay. Is that what the decedent had done for a number of years before? The decedent had obviously funded this business somehow for a period of time. It lost $13 million in 15 years. Now, this was a wholly owned, by the sea, orchard. Is that what we're talking about? Orchard, that's correct. We're talking about the Orchard Valley View something in Arizona, right? Correct. And it was a wholly owned orchard by the sea. Correct. And could have just torn up the stock certificate, let it dissolve, and they'd have been $3 million better off. But that isn't what happened. And yet, there's nothing that the court wants to do to hold the executor accountable. We respectfully suggest that if you look at this record, that this truly is a primer on how not to handle an estate. Let's go back to that orchard. Okay. Okay, we have, apparently before loans were made into that orchard, we had an estimate of $1.7 to $1.9 million as developable land, correct? Correct. Okay. And that included the commodity, the apples that were apparently growing on the tree to be marketed, right? It's hard to tell how that all shakes out, but sure, to the extent there's some. Here it is. Here's the deed. If you sell it to somebody, the whole lock, stock, and barrel would be about $1.7, $1.9. And you're saying 50% estate tax, you have it, right? Right. Okay, so you've got $1 million. Right, that you pay out. We got $1 million net. We all did. Yeah, okay, all right. Okay, right? Because I got to pay those taxes. Right. Now, instead, we transferred an estate asset of cash into that farm to take care of trees, etc., to get a new crop. The $2 million. Yeah, to get a new crop for the following year on the advice of perhaps erroneous, but on the advice of at least two people saying you'll get more of it as an operating apple farm. Yeah, two people who were out there on the apple farm getting a paycheck from the estate. Okay. Sure. We need more money. Send money. Okay, and so the $2 million, roughly, was an asset of the estate. Correct. Was it to be paid any interest on it, or was it just lateral transfer? We don't know. No, no, just the money just gets transferred. There's just checks written out there. Okay, so at least roughly $2 million is put in, then it is sold. For $750. For $750. Okay. Now, do we know if that includes the crop, the commodity? That's all the accounting shows is the $750. So the operation was sold for that much. Correct. But there's no accounting as to what happened to the apples. That's right. So we've got a gross sale of $750. Is the estate tax still the same? Of course, I've already filed a return. No, I mean, is the estate tax rate a half of the $750? The return was filed, the taxes were assessed, and then the sale occurred later, so you don't get a... Well, I'm trying to figure out how we got the $3 million. You don't get a... Well, they don't get the million net for the business. They've got the stock in the company, and they send the $2 million out there, and they write a check to the IRS for another $1 million. So there's your $3 million. Now, ultimately, they got $750 back, so it's really only a loss of $2.25 million. That's what I was just trying to do. Yeah. Okay, so sure. Okay. But nonetheless, no prudent person would do that. And I suggest that the executor should be accountable for these missteps. They're not tiny missteps. The beneficiaries are not nitpicking. This is not a, gee, I left the sweeper in the closet kind of thing. We suggest that the appropriate procedure would be to reverse the trial court on these issues and to surcharge the executor. Thank you. Thank you. Mr. Pisano. May it please the Court. My name is Michael Pisano, and I represent the executor, Dr. Michael Ambrosia. Dr. Ambrosia was appointed executor of his father's multimillion-dollar estate. This estate consisted of closely held corporations, houses, condos, and farmland in multiple states. The objector here is the decedent's grandson, having a one-tenth interest in the residue of the estate. This objector takes issue with the executor's handling of the estate. Much of the issue is looked at in hindsight, in retrospect, and not at what the executor was thinking at the time he made the decisions, based on the strength of the consultant's advice at that time. This is not a case of the executor looting the estate, hiding assets. This is a case about the objector disagreeing with the executor's decisions. Despite the many, many assets that were managed by the executor and sold during the administration of this estate, this trial was limited to five specific issues. And the trial court heard evidence and decided in favor of the executor on all of the issues. And there was substantial evidence to support the trial court's decision. My client is a cardiologist. He's foisted into managing a multimillion-dollar estate. This was a complex estate, but he acted diligently, carefully, and always in the best interest of the estate. And when necessary, he turned to the consultants, attorneys, and accountants and reasonably relied on their advice in making decisions. One example of that can be seen with Valley Farms. This is an apple orchard located in Arizona. It's a unique asset. This apple orchard had to be maintained, otherwise the trees die. Immediately upon becoming executor, Dr. Imburgia had to make a decision with regard to Valley Farms. Is he going to let the trees die and sell this land as raw land? Or is he going to continue to operate it until it's sold? Relying on the advice of his consultants and the recommendation, he decided to continue to operate this farm until it was sold. Was it a reasonable reliance on that? I mean, did he have other information such as as-is, where-is, it will bring within 1-7 to 1-9? Yes. These consultants and experts both provided reports analyzing this farm to Dr. Imburgia, and he considered those reports. And both of these individuals, Jim Afinowich, the real estate broker, and Kristen Caron, an agricultural consultant, both recommended that the estate would receive more money if this was sold as an ongoing operation, and they recommended against selling this as just raw land. So is the 1.9 raw land, or the 1.9 is as an operating entity? The opinion with regard to the value of Valley Farms, with regard to the 1.5 to 1.7 valuation, comes from a July 2013 report prepared by the agricultural consultant. And that's the value of Valley Farms as-is at that point in time. And there's criticism for not selling it at that time for that value. However, the flaw in that criticism is that there was no buyer at that time for that amount, despite the fact that Valley Farms was always for sale as soon as the executor took over. If the agricultural expert who the executor relied on says 1.5 to 1.7, and that's with these trees alive, you see maybe an issue with putting in $2 million in one season, which is greater than the value. So he had to make a decision. It wasn't as if we can look at this in retrospect. At that time, it was July. He had to make a decision. Is he going to spend the money to fertilize these trees, pollinate these trees, and harvest the crop? For the operating expenses, were they broken down? Typically, when you get a bill for applying fertilizer, herbicide, or whatever it is, you get a breakdown of how many tons is applied, when it's going to be applied, what the cost is, all those things. Were those compiled? Absolutely. Those were accounted for within Valley Farms as expenses. To the estate. Prior to the check being written. No. I don't believe there is a specific itemization as to what these expenses and the operation costs would cost. That was provided to the estate, but Dr. Imburgia was involved in communicating with the agricultural consultant, Christian Caron, as to the management of this farm. He didn't allow for a blank check. He was still involved in the management of this farm and communicating with Christian Caron, who was operating this farm, for him. And the numbers that we heard from counsel... Who is it? Sorry. You had a manager of the operation, right? Yes. It was Ms. Caron, who was operating this farm. And is she an agricultural expert? Yes. She was retained after the fact. She wasn't an existing operator. She was retained after the fact by Dr. Imburgia to assist in operating this farm, because he's a cardiologist. He doesn't know how to operate an apple tree. Oh, yeah, yeah, yeah. I know. But the bottom line is there's simple math and simple math. The question is, who was managing the farm at the time of the decedent's passing? I don't know of anyone. I think he was doing it himself. The decedent wasn't the manager, so it was a carryover manager. Exactly. And he stepped into this operation and had to figure it out. And he was under a time constraint, because things had to be done on this farm for this operation. And I'd like to get into the numbers a little bit, because I think what counsel referred to is not an accurate picture of the financial loans and the sale of the property. This property didn't sell for $735,000. This property sold for $2.4 million. The estate got to keep the crops, which were then sold for another $1.1 million. So the Valley Farms in its entirety was sold for $3.5 million. Against which, what did it owe the estate? All of the loans were repaid. No, but just as a banker would say, you got what, 3-5? How much? 3-5, total, yes. 3-5, crop and ground, right? Yes. And against that is owed to someone called the estate. Yes. How much? $2 million is owed to the estate. So 1.5 million. And $500,000 was owed to BMO Harris Bank. Oh, so now we're down to what? $1 million net. And after closing costs and commissions, the estate netted $735,000 for this asset. And I think if you look at some of the evidence provided by Jim O'Finn, which is to what this raw land would have sold for, in which there was an abundance in this area, which is why he recommended against it, I believe that in those opinions it's in the neighborhood of $400,000 to $500,000 if they were lucky. So if we're going to look at it. Well, 1.5 to 1.7 if you sold without putting the $2 million in, right? Yes, if there was a buyer, of course. And there was no buyer at that time, so he had to make a decision on what he was going to do. So the net was with the investment was how much again? $735,000 is what he was able to squeeze out of this asset, which the accountant testified this never made a profit. And as he indicated, this asset lost money every year, but he doesn't get to pick the assets that are in the estate. They're there. He has to manage them the best he can. The fact it never made a profit didn't mean it didn't have value as an asset. Of course, which is why he didn't just let it go.  And he relied on the consultants in determining what is the best course of action for selling this Valley Farms and realizing the greatest profit for the estate. And with regard to funding. I actually have a question about the condo in Chicago on Chestnut Street. It's my understanding that the property wasn't included in the sale on the final account. And there's an indication that the executive testified that the property was sold and the mortgage was paid off, but the mortgage exceeded the sales price. But the mortgage was only $102,000. Where is the appraisal? So with regard to that Chestnut property, it was included in the inventory. It's identified as a property. And there's no receipts in the accounting because it was underwater. The $102,000 that was paid, that was the balance left on the mortgage. After the property was sold, at the closing, the mortgage received all the money from the closing, and the estate had to pay an additional $102,000 to pay off the remaining balance of that mortgage because that condo was underwater at the time. But is there an appraisal anywhere? I don't know offhand, and I know that there was no appraisal submitted into evidence at the trial. So how much did the condo bring at sale? I don't know that information offhand, but I know it was less than the mortgage was worth. Would the numbers be in an accounting? Sure. I believe they would be somewhere. There should be closing documents for the sale of that condo. Well, there should be an accounting submitted to the court showing that transaction. Sure, but it doesn't show a receipt because there's no money actually received from the sale of that property. It's reflected in a disbursement to pay off the remaining mortgage. There's always a receipt for selling property, but you have to disperse out obligations that are against the property. There's always a sales price, no matter whether it's underwater or not. Sure, and I think there are closing documents that affect, that are part of the estate. In the accounting? Submitted? Is this a supervised administration? Yes. The accounting reflects receipts and disbursements. There's no receipt from the sale of this property because no money was actually given to the property at the closing. The balance of whatever was received from the closing was paid to the mortgage company. Did you have an accountant work on this estate? There was an accountant involved in this estate, and he testified at a trial. So concluding with Valley Farms here is it's important to realize that there was a $3.5 million sale price. The loans were all repaid, and after closing costs, the estate did net $735,000. And it's not the benefit of hindsight of analyzing the executor's conduct. It's analyzing at the time he made the decision. And as we've indicated, he reasonably relied on these consultants, and the court accepted that evidence and found that he did nothing unreasonable here and that he reasonably relied on the advice of the agricultural consultant and the real estate broker in deciding to continue to operate the farm. And he turned to his attorneys and accountants to determine how do we fund the operations, and they advised him he could do this with a loan. So he accepted their advice and followed their instructions, and that loan is documented in the form of a promissory note. The objector also takes issue with the attorney's fees that were paid to Attorney Tumgate. But I think there's a – and he refers to some penalties and interest, but there's a background that I think has to be understood. The two facts that they rely on with regard to the real estate tax late payment and penalty is that there was a late payment and there was an underpayment, and both of those facts were just proven at trial. The taxes were due nine months after the decedent's death. The estate secured an extension through May 20th of 2014 and timely paid the taxes that were due and filed the return. You're talking the inheritance tax? Yes, the estate tax. The federal estate tax. And the total federal estate tax liability was $2.6 million. However, that entire amount was not due on May 20th, 2014. Only about $700,000 of that was due, and that was paid. The reason it wasn't all due is because the estate applied for a 6166 election under the IRS code, which allowed them an installment payment plan to pay the remaining. The reason they applied for this is this estate was what they considered cash poor. It had a lot of assets and a lot of land and corporations, but insufficient cash to pay the tax liability. And there's no evidence that they were short by only $250,000 that was paid to the attorney. That $250,000 was paid at the advice of the attorney and the accountant because it would assist in the application for that 6166 election to allow the estate to have a payment plan because there was insufficient cash in the estate to pay the tax liability. And the IRS approved that election and provided for a payment plan. They assessed penalties and interest.  He negotiated a refund for the majority of the penalties and interest and advised the executive that if they were going to seek the remaining, they'd likely have to file it. So what you're telling me in a simple-minded way for me to understand is that if you qualify as a cash poor estate, you could do an installment payment on the federal estate tax without interest? Yes. Well, there's a small 2% interest per year. Okay, I guess. Yeah. So there is interest that is not refundable for the election to do an installment. That's true. That's true. There is a 2% interest per year, and these were ultimately the taxes were finally paid in February of 2015 in full. And it cost a quarter of a million dollars to secure that installment plan? No, it was a decision that it would, if that was paid and that cash was no longer in the estate and that's a legitimate expense, then it would be more attractive to the IRS to approve this payment plan. It looked like there was a little more cash for it then? I'm sorry? It looked like the estate was a little bit more cash for it? Yeah, I think everyone wanted to put the estate in the best position to secure this payment plan. Okay. And I want to respond very briefly to the Chicago Cups tickets and the Chicago Bears issue. You know, we're talking about the right to buy season tickets. It's not the season tickets themselves. And the Chicago Cups tickets are not a transferable right. There is no value. They cannot be transferred. So there is no value. There is no market for these tickets. It's not an asset of the estate. And the Chicago Bears tickets, those were an asset of QSE, one of the closely held corporations. So those were not something to be independently accounted for. The standard to be employed here- Wait a second. I'm sorry. If they were an asset of one of the closely held corporations that are part of the estate, don't they have to be accounted for? They are accounted for through QSE. I think the complaint by the objector is that they're not individually identified on the inventory as an asset. And if they're an asset of QSE, there's no need to identify every single asset of QSE. I just didn't understand. I'm sorry. I wasn't clear. They're accounted for through QSE. But you're telling me it's the same with the Bears tickets as it is with the Cubs, that it's a personal right? No. The Bears tickets are different. They are transferable. Okay. And they were transferred when QSE was sold along with all of its assets. The Bears tickets were sold- So presumably they were included as an asset of the company and reflected in the sale price of the company. Absolutely. Okay. So let's go to the Cubs tickets. Okay. Yes. You're saying that's a personal right that expires upon the death of the holder. Yes. Okay. And that's what happened. Yes. And so therefore they did not have any value. They could be distributed to the beneficiaries. That's accurate, yes. That's your argument? That's true. They cannot be transferred. Was there some controversy about the executor getting season tickets for the Cubs? Yes. The executor in his individual capacity approached the Chicago Cubs and negotiated the purchase of those tickets. They weren't transferred from the estate to the executor. Is it the tickets that are being purchased or is it a personal right that you're paying for to purchase tickets? The right to purchase has no value. You're not buying that right. You're buying the season tickets. So the Bears PSL, there is a value to that license because it's transferable. It's an asset. The Chicago Cubs tickets are not an asset. There is no price for that right. Okay. So $35,000 is to buy the seats. For that given year, yes. The tickets for that year. But how is it that the right to purchase that license for the Cubs expired upon its death and that it was an asset and wasn't something that was transferable? How is it that those tickets then are something that your client was able to purchase? He contacted the Chicago Cubs organization and negotiated the purchase of those tickets just as anybody else in the public could have done. Didn't he have a duty to notify the other people in this estate that those are available? I don't think so because I believe that those – Isn't that self-dealing? That something an executor is absolutely prohibited from doing? But there's no value to it. So it's not as if it could have been sold on the market, that this is an estate asset that could have been sold on the market, and he usurped that opportunity. It wasn't an opportunity to buy these tickets. It was just his foresight to go to the Chicago Cubs and ask, I know these tickets are available. Can I purchase them? Couldn't they have been brokered if they were purchased by the estate? Couldn't they have been brokered like on an aftermarket site? I suppose. I'm not sure that the organization would allow the estate to purchase it, but I also don't think that would be an advisable use of the estate funds is to engage in the ticket brokering business. He was almost certain to make money, unlike the $2 million insecure loan to the farm. I mean, I'm not joking. I know. I mean, I just think the fact that he took it upon himself to contact this organization and to purchase something and he says that nobody else had a right to it, the right to purchase expired upon the decedent's death, is troubling. I understand, but I think every other beneficiary, everyone in the public, could have approached the Cubs and bought those tickets. But you have to know that that license had expired and all these things. That's part of what is being argued, is that some of this was not known. It wasn't inventory. It wasn't accounted for properly. And I just return to the fact that there is no value to that right to buy season tickets. Somebody has to pay for the entire season, and I think he pays a cost of $30,000 to $40,000 a year for these. Is there a waiting list? Do you know if that was ever discussed? I'm not sure. I imagine. I'm not sure. And certainly there was no evidence presented at trial with regard to the value of these tickets. And I would just say that the standard to be employed here is a manifest weight of evidence standard. And reversal is appropriate if the trial court's decision was unreasonable, arbitrary, or not based on the evidence. Was it ever listed, the Cubs tickets, as an asset of the estate? No, it was not listed as an asset. It was never inventoried separately? Again, if we're referring to the right to buy that, no, it wasn't. No, I'm just talking about an inventory. Yeah, the inventory doesn't reflect a right to buy Chicago Cubs season tickets because that right has no value. It's not an asset. It can be transferred. Okay, well, that's what I'm asking, too. I mean, was it listed in an inventory? I don't believe it was. What happened to the tickets following the decedent's death for the season of 2013? I don't know. I believe the decedent died in February of 2013. I don't think the season started until April or May, so I don't know. I don't know exactly if they were purchased before he died or after he died. I don't know the answer to that question, nor was there any evidence presented to that effect. And, you know, I think there was overwhelming evidence that the trial court relied on, that he made a reasonable decision with regard to finding that there was no mismanagement, there was no waste, there was no breach of fiduciary duty on the part of the executor. He reasonably relied on the advice and recommendation of consultants. I don't think his conduct is properly evaluated in hindsight, particularly with Valley Farms. Those were immediate decisions that he had to make, and I believe the trial court made the right decisions, and I'd ask that this court respectfully affirm the trial court's decision on all the issues. Thank you. Thank you, Mr. Pizzano. Mr. Heller, rebuttal. Thank you, Your Honor. Very briefly, the fact that there aren't any accounting papers for any of the condos in Chicago is concerning and is something that should have been required by the executor. Why is the estate paying this money for one condo when there were multiple condos in Chicago? Was the mortgage on one or both? These are the kind of things that say to you there's a problem with the way this estate was handled. But to the extent that the executor convinced not an expert, is it, I mean, bad business decisions get made every day. Is his reliance on the advice of experts or on the attorney or are those unreasonable in the circumstances? I think that's what we have to look at. Is it a breach of the fiduciary duty of the executor to rely on that? You know, the funny thing is that a lot of those excuses didn't even come up until different phases of the litigation. For example, today or at the trial was the first time, even though we'd taken the deposition of the attorney, Mr. Tungate, was the first time that he suggested that the reason I took the money out was because I wanted the estate to look poorer. I mean, it was a moving target. First, I took it out because I went back and looked at my records and so I spent more time. Then it was, well, I decided I should take a flat fee. And then it was, well, we did it to make the estate look poorer so we could qualify for an installment objection. I mean, all you have to do is go on the Internet and find out that there's a waiting list to buy Chicago Cubs tickets and that the right to buy them has value because the tickets are worth more than their face. And what happened to the tickets? The season started in April. What happened to the tickets that season? The question is the right. We're talking about the right. Is the right apparently opposing counsel is saying, the estate is saying, the executive is saying, the seat, that right expired on the last breath. Then how did the executive get that right? You can't call the Cubs today and get the right to buy season tickets. You'd have to go on the waiting list and wait your turn. I'd never do it anyway. Okay. Cubs. But nonetheless, if that's the case, if it can't be done, if that right expired, how is it that the executor personally ended up with that right? Why didn't he negotiate for that right not to be transferred to him personally but to all of the heirs equally or to the estate? Because he wanted it, and he took it, and he kept it. That's why. So if the right survived in some way, your argument is it was a personal right that was arguably an asset of the decedent's estate. Absolutely. And that, therefore, it should have been inventoried, valued, and distributed. Correct. Or? Or distributed. Or the estate itself purchased and then resell. Right. Is that what you're saying? Absolutely. Thank you very much. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible.